UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| RICHARD GRANADOS, | Case No. 3:20-cv-00427-ART-CSD |
| Petitioner, | ORDER |
| v. | |
| Nethanjah Breitenbach,[1] *et al.*, | |
| Respondents. | |

## I.    SUMMARY

A Nevada jury convicted Petitioner Richard Granados of conspiracy to commit murder, two counts of first-degree murder with use of a deadly weapon, and attempted murder with use of a deadly weapon. He is sentenced to 50 years to life imprisonment. (ECF No. 34-2 at 168–69.) Granados filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 2) claiming insufficient evidence supports his convictions for first-degree murder, his counsel was ineffective, and cumulative error. As discussed below, the petition is denied but a certificate of appealability is granted for Grounds 1, 5, and 10.

## II.    BACKGROUND SUMMARY[2]

### A.    History of Conflict Between Granados and Juan Carlos Benitez

When Karla Benitez and her brother, Juan Carlos Benitez ("Benitez"), were in high school, Benitez dated Paula Arenas ("Arenas"). Karla, Benitez, and Arenas

---

[1] The state corrections department's inmate locator page states that Granados is incarcerated at Lovelock Correctional Center where Nethanjah Breitenbach is the warden. Lovelock Correctional Center Facility | Nevada Department of Corrections (nv.gov).  The Court will direct the Clerk of the Court to substitute Nethanjah Breitenbach for respondent Tim Garett under Rule 25(d) of the Federal Rules of Civil Procedure.

[2] This background summary is based on the state-court record and serves only as background to the issues presented in this case. The Court does not summarize all such material. Failure to mention evidence does not mean that it was overlooked.

were friends with Jose Granados, Jr. ("Jose, Jr."). After Arenas broke up with Benitez, Jose, Jr. introduced her to his uncle, Granados. Benitez and Jose, Jr. had a falling out over that introduction. After the break-up, Karla and Benitez threw bottles at Arenas's window and she reported it to the police. Arenas and Benitez resumed communications on friendly terms at some point after their breakup and Arenas did not tell Granados about it. Arenas claimed she stopped communicating with Benitez after she became pregnant with Granados's second child in 2009. Arenas agreed her relationship with Granados caused problems between Benitez and Jose, Jr. She said Granados believed Benitez had "punched his tires." (ECF Nos. 34-3 at 220–32; 34-4 at 116, 122–29, 136–44, 156, 163–64.)

Lilibet Flores knew Arenas, Benitez, and Jose, Jr., and was aware of ongoing tension between Benitez and Jose, Jr. about Arenas's relationship with Granados. She testified that Benitez moved to Texas in 2008 but returned to Las Vegas in 2009. Flores said Benitez still had problems with Jose, Jr. when he returned to Las Vegas. (ECF Nos. 34-3 at 229–30; 34-5 at 4–10, 32–36.)

### B.    Harassment of the Granados residence before the Shootings

Cesar Sosa testified he met Benitez and Paul Armando Rodelo ("Rodelo") at a Las Vegas nightclub around 5:00 a.m. on August 10, 2009. They went to Rodelo's house in Benitez's truck, and on the way there, they stopped and threw bottles at Granados's house. (ECF No. 34-3 at 118–27.)

Granados testified he and Arenas lived with their daughter, and Jose, Jr., in a house they rented next door to his brother, Jose Granados, Sr. ("Jose, Sr."). That morning, Granados backed his white truck out of his garage at around 8:30 or 9:00 a.m. to go to the store and heard his "tires running over something." He discovered "beer bottles broken all over the place." Granados said he returned home, had breakfast, and left between 9:30 and 10:15 a.m. to look for work at Jeremy King's house, which is 20 to 30 minutes away, but no one was there, so he returned home. As he pulled into his driveway, Granados looked in his rear-

view mirror and saw Benitez driving a dark blue F150 pickup truck "kind of close" to him. Benitez had two passengers in the front and two in the back. Granados said he was surprised to see Benitez and was concerned because Benitez "tried to run [him] off the freeway one time . . . ," slashed his tires, and tried to cut his brake line. Granados parked his truck in the driveway and went inside his house. (ECF No. 34-5 at 166–69, 173–83, 228–30.)

Sosa testified he, Benitez, and Rodelo, went to buy more beer but stopped across the street from the house where they had thrown the beer bottles. He said Benitez and Rodelo were talking at a man they saw exit a white truck and enter the home. Sosa said they "took off" to buy more beer when they saw the man at the house. (ECF No. 34-3 at 128–36.)

Arenas testified that about 40 minutes before the shootings she saw Benitez in his truck outside her home "cussing" "[l]ike, come out, you son of a bitch, we're here" with two men in the bed of his truck yelling "bad things" "damning" them, and yelling for them to "come out." She did not see Benitez with any weapons or point a gun at the house. Granados said he accompanied Jose, Jr. to the gas station that morning because "[Jose, Jr.] said that he was afraid for his life and that [Benitez] and them wanted to get him." Granados said when he returned home, he shot basketball in the driveway with the kids. (ECF Nos. 34-4 at 138–45, 188–89; 34-5 at 185–86, 241.)

### C.    The Shootings

Sosa testified that after they got more beer they drove past the house where they had thrown bottles and saw 5 to 6 men outside Granados's home. Sosa said a couple of the men at the house waved for them to return, so Benitez, who was driving, made a U-turn. Granados testified he was leaning against his truck looking at his house with his back to the street when Jose, Jr. said, "Here they come." Granados said he immediately opened the trunk of his truck and pulled out a rifle. He said the rifle was a gift from a brother, someone else had previously

loaded the magazine, and this was the very first time he ever used a firearm. Sosa thought they were going to get into a fistfight as they had no weapons, but the other men rushed them and the man who had earlier exited the white truck started shooting. (ECF Nos. 34-3 at 137–45, 156; 34-5 at 189–91, 261–65, 276.)

Granados heard Benitez's truck getting loud and saw it make a quick U-turn, approach Granados's driveway, and saw the passengers in Benitez's truck make movements like they were rolling down the windows. Granados said he got scared because he thought Benitez and his companions had guns, so when Benitez's truck came toward him, he fired the rifle. Benitez's truck crashed in front of Granados's house and then Jose, Sr. walked up to the truck and fired a small caliber handgun into Benitez's truck. (ECF No. 34-5 at 190–98, 254–56.)

Neither Sosa nor Benitez nor Rodelo had firearms or anything in their hands when they were shot. Sosa climbed out of the truck window, hid behind Benitez's truck until he was shot, and then ran to an apartment complex until police took him to the hospital. (ECF No. 34-3 at 146–56.)

Clark County Medical Examiner Lisa Gavin testified Benitez was pronounced dead at the scene and Rodelo died at the hospital. Benitez and Rodelo died of multiple gunshot wounds and had consumed alcohol at three times the legal limit plus cocaine. Gavin was unable to determine the caliber of bullets that struck Benitez and Rodelo. (ECF No. 34-4 at 85–86, 96–101, 109–113.)

### D.    Investigation and Neighbor's Video Surveillance

Las Vegas Metropolitan Police Department Sergeant Christopher O'Brien obtained surveillance video from a neighbor's security system that depicted beer bottles thrown at Granados's home at 5:30 a.m. on the morning of the shootings. The video shows Benitez driving by Granados's house and audio of breaking glass and shouting. O'Brien said the video depicted Jose, Jr., Jose, Sr., and Granados repeatedly driving down the street outside their homes between 11:57 a.m. and 12:16 p.m. at which point all three of them parked in the driveways of their

4

adjacent residences. According to O'Brien, at about 12:21 p.m. the video depicted people present in the driveway of Granados's home and Benitez driving his truck in front of the home. According to O'Brien, the surveillance audio captures shots fired 19 seconds after Benitez's arrival, followed by a second round of shots only seconds later, but the video did not capture a depiction of Benitez's U-turn or crash. No one admitted they saw the shooting. Metro Crime Scene Analysts Amy Nemcik and Erin Taylor recovered no weapons from Benitez's truck. (ECF Nos. 34-3 at 84; 34-4 at 45–47, 62; 34-5 at 49, 81–95, 101–09.)

Granados testified he was afraid of the police and retaliation by the Benitez and Rodelo families, so he went to stay with family in California where he was eventually arrested. Granados did not know if he fired the bullets that killed Benitez and Rodelo because Jose, Sr. also fired shots. O'Brien testified he arrested Jose, Jr. but released him, and the investigation focused on Jose, Sr., and Granados. Jose, Sr. was captured in Utah. (*Id.* at 63–73, 196–97, 273.)

### E.    State Court Proceedings

Granados and Jose, Sr. were jointly indicted for conspiracy to commit murder, two counts of murder with the use of a deadly weapon for the deaths of Benitez and Rodelo, and attempted murder with use of a deadly weapon for the injuries to Sosa. On the first day of trial, Jose, Sr. entered an *Alford* plea to two counts of voluntary manslaughter with use of a deadly weapon and a stipulated sentence of 6 to 15 years imprisonment. A jury convicted Granados on all counts and Granados unsuccessfully challenged his convictions on direct appeal and in state postconviction proceedings. (ECF Nos. 1-3 at 9–16, 1-9 at 51–54; 1-10 at 148–55; 34-2 at 3–5, 168–69.)

### III.    LEGAL STANDARDS

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the legal standards for my consideration of the petition:

///

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of § 2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent under § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10, 412) (internal citation omitted).

The Supreme Court has instructed that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652,

6

664 (2004)). The Supreme Court has stated that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult-to-meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.") (internal citations omitted). A state court need not cite Supreme Court cases or be aware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). The petitioner carries the burden of proof. *See Cullen*, 563 U.S. at 181 (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

## IV. DISCUSSION

### A. Ground 1—Sufficiency of the Evidence

Granados alleges the evidence presented at his trial is insufficient to support a finding beyond a reasonable doubt that he did not act in self-defense and that he committed first-degree murder. (ECF No. 2 at 12–14.)

#### 1. Additional Background

The trial court instructed the jury that "[e]ach member of a criminal conspiracy is liable for each act . . . if the act . . . is in furtherance of the object of the conspiracy," "[t]he act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators," and "[e]very conspirator is legally responsible for a specific intent crime of a co-conspirator so long as the specific intent crime was intended by the defendant." (ECF No. 1-2 at 133.) The trial court determined sufficient evidence supported a lying-in-wait instruction based on the surveillance video, Sosa's testimony, and "Granados's own testimony that at the time that the blue truck arrived he was standing next to—basically next to his firearm . . . ." (ECF No. 34-5 at 282–85.) The trial court instructed the jury on the requirements for first-and second-degree murder and the lesser-included offense of voluntary manslaughter. (ECF No. 34-2 at 107–

121.) The jury was also instructed on the requirements for self-defense, as required by *Runion v. State*, 116 Nev. 1041, 1049–52, 13 P.3d 52, 58–59 (2000), including the requirement that the State prove beyond a reasonable doubt that Granados did not act in self-defense, and if the State failed to do so, the jury must acquit him. (*Id.* at 126–30.)

## 2.    Applicable Legal Principles

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364–65 (1970). A federal habeas petitioner faces a "considerable hurdle" when challenging the sufficiency of evidence to support a conviction. *Davis v. Woodford*, 384 F.3d 628, 639 (9th Cir. 2004). A jury's verdict must stand if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Davis*, 384 F.3d at 639 (quoting *Jackson*, 443 U.S. at 326.) The *Jackson* standard applies "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* (quoting *Jackson*, 443 U.S. at 324 n.16.)

Nevada law defines a conspiracy as "an agreement between two or more persons for an unlawful purpose." *Bolden v. State*, 121 Nev. 908, 912, 124 P.3d 191, 194 (2005). "A person who knowingly does any act to further the object of a conspiracy, or otherwise participates therein, is criminally liable as a conspirator . . . ." *Id.* "[A] defendant may not be held criminally liable for the specific intent crime committed by a coconspirator" unless the State proves the defendant also

possessed the specific intent to commit the crime. *Id.* at 922, 124 P.3d at 200. "Evidence of a coordinated series of acts furthering the underlying offense is sufficient to infer the existence of an agreement and support a conspiracy conviction." *Id.* "Direct evidence is not required to establish a conspiracy, but circumstantial evidence may be relied upon." *Sheriff, Humboldt Cnty. v. Lang*, 104 Nev. 539, 543, 763 P.2d 56, 59 (1988).

Nevada defines murder as "the unlawful killing of a human being . . . [w]ith malice aforethought, either express or implied." Nev. Rev. Stat. § 200.010(1). "Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof." Nev. Rev. Stat. § 200.020(1). "Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." Nev. Rev. Stat. § 200.020(2). Nevada defines murder of the first degree as murder which is "[p]erpetrated by means of poison, lying in wait or torture, or by any other kind of willful, deliberate and premeditated killing." Nev. Rev. Stat. § 200.030(1)(a). Willfulness is defined as "the intent to kill." *Byford v. State*, 116 Nev. 215, 236, 994 P.2d 700, 714 (2000). Deliberation is "the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for and against the action and considering the consequences of the action." *Id.* Premeditation is "a design, a determination to kill, distinctly formed in the mind by the time of the killing." *Id.* at 237, 994 P.2d at 714. Lying in wait is "watching, waiting, and concealment from the person killed with the intention of killing or inflicting bodily injury upon that person." *Collman v. State*, 116 Nev. 687, 717, 7 P.3d 426, 445 (2000) (footnote and citation omitted) (emphasis omitted).

"A killing done in self-defense, although deliberate, is neither unlawful nor activated by malice" and therefore "self-defense negates essential elements of the crime of murder." *See Ybarra v. Wolff*, 616 F. Supp. 347, 349 (D. Nev. 1985) (citing

*Kelso v. State*, 95 Nev. 37, 42 588 P.2d 1035, 1039 (1979)). "If a person kills another in self-defense, it must appear that":

> 1. The danger was so urgent and pressing that, in order to save the person's own life, or to prevent the person from receiving great bodily harm, the killing of the other was absolutely necessary; and

> 2. The person killed was the assailant, or that the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given.

Nev. Rev. Stat. § 200.200.

### 3.    State Supreme Court's Determination

The Supreme Court of Nevada applied *Jackson* and determined there is sufficient evidence for the jury to reasonably infer Granados committed first-degree murder and did not act in self-defense:

> Appellant first contends that there was insufficient evidence to support his first-degree murder convictions because the State failed to prove that he was not acting in self-defense. We review the evidence in the light most favorable to the State to determine whether sufficient evidence was presented to establish guilt beyond a reasonable doubt as determined by a rational trier of fact. *See Origel-Candido v. State*, 114 Nev. 378, 381, 956 P.2d 1378, 1380 (1998); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also St. Pierre v. State*, 96 Nev. 887, 891, 620 P.2d 1240, 1242 (1980) ("[B]ecause self-defense is justifiable, it negates the unlawfulness element."). Here, the jury heard testimony that appellant and one of the victims had an on-going dispute and that the victims threw beer bottles at appellant's house early the morning of the incident and later parked in the street outside the house and shouted obscenities at appellant before driving away. The jury further heard that later that day, appellant and his companions drove around the neighborhood in separate vehicles before returning to appellant's house just before the incident, where they then stood outside and waved the victims over as the victims were driving past, and from where, as the victims' car approached, appellant and a companion fired multiple rounds at the car, killing two victims and wounding a third, and then fled the scene. No other weapons were located near the victims.

> The jury could reasonably infer from this evidence that appellant was not acting in self-defense but instead actively searched for the victims and then, upon locating them and drawing them near, killed them willfully, deliberately, and with premeditation. NRS 200.030(1)(a) (murder is first-degree when "[p]erpetrated by means of . . . lying in wait or . . . by any other kind of willful, deliberate and premeditated killing"); *Pineda v. State*, 120 Nev. 204, 212, 88 P.3d 827, 833 (2004) (explaining that a homicide may be justified by self-defense only when the jury finds that the defendant reasonably believed that he was in imminent danger of being seriously injured

10

or killed); *see McCurdy v. State*, 107 Nev. 275, 277, 809 P.2d 1265, 1265 (1991) (walking up to rival gang members with loaded gun, pointing, and pulling trigger sufficient to support first-degree murder verdict). Although appellant testified that he was scared and thought the victim had guns, it is the jury's role to determine the weight and credibility to give testimony, and the jury's verdict will not be disturbed on appeal where, as here, substantial evidence supports the verdict. *See Bolden v. State*, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981); *see also McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992).

(ECF No. 1-9 at 51–53.)

### 4.    Deferential Analysis of Ground 1

The Nevada Supreme Court's determination was neither contrary to nor an unreasonable application of *Jackson* and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. A rational jury could conclude Granados committed murder. First, the jury found that Granados conspired to murder the victims and Granados does not contend there is insufficient evidence of conspiracy to commit murder. Thus, even if Jose, Sr.'s weapon fired the fatal shots, there is sufficient evidence of murder under a conspiracy theory. Second, there is sufficient evidence that Granados had the requisite specific intent to commit murder. A rational jury could conclude Granados and Jose, Sr., searched for Benitez, and anticipating Benitez's return, lay in wait outside their homes, with loaded firearms readily nearby. Granados admitted he instantly grabbed his rifle as soon as Jose, Jr. told him, "Here they come" and that he fired multiple shots into the vehicle, followed by Jose, Sr. firing additional shots into the driver's side of the vehicle at close-range. Finally, a rational jury could conclude the State proved Granados did not act in self-defense by finding it was not necessary for Granados to shoot Benitez to avoid death or great bodily injury. A rational jury could reject Granados's explanation that he shot Benitez because he feared for his life as Granados did not attempt to run away from Benitez's oncoming truck, and instead fired 22 times, followed by Jose, Sr. firing six shots at close range, before they fled the scene. Although Granados testified that he was fearful when Benitez accelerated

11

his engine and drove his truck directly toward him, a reviewing court presumes the jury resolved conflicting inferences in the evidence. *Jackson*, 443 U.S. at 326.

The Nevada Supreme Court reasonably applied *Jackson* to the state court record in determining there is sufficient evidence for a rational jury to conclude Granados did not act in self-defense and instead committed first-degree murder. Granados is therefore not entitled to federal habeas relief for Ground 1.

### B. Grounds 4–9—Effective-Assistance-of-Counsel

Grounds 4–9 allege trial counsel rendered ineffective assistance in violation of the Sixth and Fourteenth Amendments. (ECF No. 2 at 17–56.)

### 1. Applicable Legal Principles

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). A petitioner claiming ineffective assistance of counsel ("IAC") must demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

For *Strickland*'s performance prong, a petitioner making an IAC claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his or her perspective at the time. *Id.* at 689–90. In considering such claims, a court "must indulge a strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.*

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" as "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" and applied in tandem, "review is 'doubly so.'" *See Harrington*, 562 U.S. at 105 (internal citations omitted); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

### 2.    Ground 4—The Burden to Prove Self-Defense

Granados alleges trial counsel ineffectively conceded Granados bore the burden to prove self-defense. (ECF No. 2 at 19–21.)

### a.    Additional Background

During cross-examination of Sergeant O'Brien, trial counsel arguably suggested Granados bore the burden to prove self-defense; however the trial court clarified the State had the burden to prove Granados did not act in self-defense:

Q:    But he did state to you or claim to you that the shooting was done in self-defense; is that correct?

A:    That's what he inferred, yes.

Q:    And just because a suspect claims self-defense, that doesn't necessarily end the debate, does it; in other words, it didn't stop you from arresting him, did it?

A:    No.

Q:    So when a suspect claims self-defense, that's something they have to ultimately prove later on in court; is that fair to say?

A:    Yes.

Q:    And he was indeed arrested that day right after the interview, if not before; is that correct?

A:    Yeah. I had already generated warrants. He was already under arrest for the double murder and the conspiracy and the attempt murder.

. . . .

13

THE COURT: Did you really need to say that—or did you need to suggest it was the defendant's burden to prove self-defense at trial?

[DEFENSE COUNSEL]: No, Your Honor. Just the—

THE COURT: All right. Because the jury will be instructed that it's the burden of the State to prove by a—beyond a reasonable doubt that there was no self-defense.

[DEFENSE COUNSEL]: Right. Right.

THE COURT: So I want to make sure that the jury is going to be understanding of the law on that, and I don't want the jury to think at this point in time that the defendant has any burden at all at this point in time.

[DEFENSE COUNSEL]: That's right. Thank you, Your Honor.
. . . .
THE COURT: I didn't want the record to be clear—or unclear on what the law is going to be stated at the end of this case.

(ECF No. 34-5 at 106–07.) The trial court instructed the jury that "[t]he State must prove beyond a reasonable doubt that the defendant did not act in self-defense" and if the jury found the State failed to do so, it must find Granados not guilty. (ECF No. 34-2 at 126–30.)

### b.    State Supreme Court Determination

The Supreme Court of Nevada determined Granados failed to meet the requirements of either *Strickland* prong:

> To demonstrate ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness and that prejudice resulted in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432, 683 P.2d 504, 505 (1984) (adopting the *Strickland* test). The petitioner must demonstrate the underlying facts supporting the claim by a preponderance of the evidence, *Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004), and both components of the inquiry must be shown, *Strickland*, 466 U.S. at 697. For purposes of the deficiency prong, counsel is strongly presumed to have provided adequate assistance and exercised reasonable professional judgment in all significant decisions. *Id.* at 690. We give deference to the district court's factual findings that are supported by substantial evidence

14

and not clearly wrong but review its application of the law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

The district court resolved all of Granados' claims by a general determination that they arose from counsel's strategic decision to pursue a self-defense theory of the case. This decision was in error. Nevertheless, for the reasons discussed below, the district court reached the correct determination in denying the petition. *See Wyatt v. State*, 86 Nev. 294, 298, 468 P.2d 338, 341 (1970) ("If a judgment or order of a trial court reaches the right result, although it is based on an incorrect ground, the judgment or order will be affirmed on appeal.").

Granados . . . argues that counsel should not have informed the jury that the defense bore the burden of proving self-defense. The record repels Granados' claim. In cross-examining the arresting officer, counsel elicited that Granados' invocation of self-defense was a matter for trial, not something resolved by the officer's rejection of it in deciding to arrest Granados. Granados has not shown that this cross-examination was objectively unreasonable. Further, Granados was not prejudiced by any confusion, as the district court immediately clarified the self-defense standard and the jury received an appropriate self-defense jury instruction. Granados thus has not shown deficient performance or prejudice. Therefore, the claim was properly denied.

(ECF No. 1-10 at 148–49.)

### c.    Deferential Analysis of Ground 4

The Nevada Supreme Court's determination is neither contrary to nor constitutes an unreasonable application of *Strickland*'s prejudice prong and is not based on an unreasonable determination of the facts in light of the evidence presented during the state court's proceedings. The jury was instructed that the State had the burden to prove beyond a reasonable doubt that Granados did not act in self-defense. Any possible misunderstanding occasioned by counsel's cross-examination was clarified by the trial court in the jury's presence. The state supreme court's application of *Strickland*'s prejudice prong is objectively reasonable. Granados is not entitled to habeas relief for Ground 4.

### 3.    Ground 5—Advice During Plea Negotiations

Granados alleges trial counsel did not thoroughly discuss plea offers and explain the value of accepting the offer relative to a chance of success at trial. (ECF No. 2 at 22–25.)

1

### a.    Additional Background

Before the presentation of evidence at trial, trial counsel informed the state district court about the status of plea negotiations:

> [DEFENSE COUNSEL]: [W]e had some settlement discussions back and forth with the State. The last offer that was made by the State to resolve this matter was to have Mr. Granados plead guilty to a second-degree murder with one deadly weapon enhancement, so basically one count naming all three—all victims under one amended indictment.
>
> There is also another offer of two second degrees, I think, and one attempt murder, right to argue as to concurrent or consecutive. So we had those two offers on the table as of Monday. Both were rejected, but I just wanted to make sure it's clear.
>
> I did relay those offers to you; is that correct?
>
> THE DEFENDANT: Correct.
>
> [DEFENSE COUNSEL]: And you did turn those down at this time; is that correct?
>
> THE DEFENDANT: That's correct.
>
> [DEFENSE COUNSEL]: All right. That's it.
>
> THE COURT: All right. Very well. So that's fine. Then we can proceed and bring in the jury.

(ECF No. 34-3 at 7–8.)

At the state postconviction evidentiary hearing, Granados testified trial counsel verbally informed him about "some offers" but never sat down with him to go over them and never brought him a written offer. He claimed he told counsel he would sign the deal if counsel brought him "a binding plea," but counsel "never did." (ECF No. 1-9 at 206–07.)

Trial counsel testified at the state postconviction evidentiary hearing that he "was trying to get a negotiation for [Granados]" "from the get[-]go" but "there were never any great deals in this case." Counsel spent several hours with Granados and the State prosecutors "trying very hard to see" if they could reach a "last minute deal to settle the case." Counsel discussed two offers with Granados, and they "went back and forth" but Granados "did not want to take

16

them." Counsel said, "if the right offer was there I think he would take it, but it was just never put on the table." Counsel said they discussed the offers at length because if he didn't "take the deal," "then trial was going to start any minute," and Granados understood he faced "life in prison" if he lost at trial. At the announcement of the verdict, Granados told counsel he should have taken the deal. (*Id.* at 181–87.)

### b. Applicable Legal Principles

The right to effective counsel extends to plea negotiations. *Hill v. Lockhart*, 474 U.S. 52, 57–60 (1985) (extending *Strickland*'s two-part test to plea bargaining context). "In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, 566 U.S. 156, 163, (2012) (citations omitted). Where counsel's advice leads a defendant to reject an offer, a petitioner must show that but for the ineffective advice of counsel there is a reasonable probability that (1) the defendant would have accepted the plea; (2) the prosecution would not have withdrawn it; (3) the court would have accepted its terms; and (4) the conviction or sentence, under the offer's terms would have been less severe than under the judgment and sentence that were imposed. *Id.* at 163–64.

### c. State Supreme Court's Determination

The Supreme Court of Nevada determined Granados failed to establish either *Strickland* prong:

> Granados . . . argues that counsel should have discussed the State's plea offers with him more thoroughly and that he would have pleaded guilty if counsel had discussed the terms with him. The State offered pleas to either second-degree murder with the use of a deadly weapon or two counts of second-degree murder and one count of attempted murder. Counsel testified at the evidentiary hearing that he discussed the offers at length with Granados, who declined them and was frustrated at the offers' severity. Granados' claim that he would have accepted one of the plea offers but for counsel's advice is repelled by his contemporaneous rejection of both immediately before trial after counsel stated them on the record, particularly where he testified at the evidentiary hearing that counsel urged him to accept one of the pleas. *Cf. United States v. Lefkowitz*, 289 F. Supp.

2d 1076, 1088 (D. Minn. 2003) ("[T]he fact that a defendant later regrets foregoing a plea offer and proceeding to trial is not evidence of ineffective assistance of counsel."). The district court therefore reached the correct result in denying this claim.

(ECF No. 1-10 at 149–50.)

### d.    Deferential Analysis of Ground 5

The state supreme court's determination is neither contrary to nor constitutes an unreasonable application of *Strickland* and is not based on an unreasonable determination of the facts in light of the evidence presented during the state court's proceedings. Granados does not specify what additional advice counsel should have provided to Granados or that such additional advice would have caused Granados to accept one of the offers rather than proceed to trial. Although the record shows Granados was new to the criminal justice system, it also shows counsel explained the plea offers to him, urged him to accept one of them, Granados was aware he faced life imprisonment if convicted at trial and he would endure trial if he did not accept a plea offer, and that Granados rejected all offers as unacceptable. Granados's preference to take a chance at trial rather than accept the offers is evident by his reaction of regret when the jury announced its verdict. The state supreme court could reasonably conclude the record does not establish a reasonable probability Granados would have accepted one of the offers, rather than go to trial, had counsel sat down and explained a written version of the offers. Because the state supreme court reasonably applied *Strickland* in determining Granados fails to establish counsel's performance fell below the wide range of reasonable and professional competence or a reasonable probability Granados would have accepted the offers had counsel presented him with a written version of the offers and explained them in detail, Granados is not entitled to federal habeas relief for Ground 5.

///

///

///

18

### 4.    Ground 6—Investigation and Defense[3]

Granados alleges trial counsel failed to (A) conduct an adequate pretrial investigation into prior acts of violence and/or aggression by Benitez; (B) investigate the testimony of D.H. before calling him to testify; and (C) properly prepare and advise Granados regarding his trial testimony. (ECF No. 2 at 25–34.)

#### a.    Ground 6(A)—Benitez's Prior Acts of Violence

Granados claims trial counsel failed to investigate and present evidence corroborating Granados's testimony about prior instances where Benitez attempted to harm Granados, slashed his tires, attempted to cut his vehicle brakes, and threatened others around him. (ECF No. 2 at 27–30.)

At trial, Granados testified he was surprised when he saw Benitez in his rear-view mirror on the morning of the shooting and was concerned because Benitez had twice tried to run him off the road. Granados said Arenas and another friend were with him during one incident when Benitez tried to run him off the freeway. Granados did not report the incidents to police because he did not want to bother doing it the first time and he had been drinking the second time. Granados believed Benitez was also responsible for slashing his tires and trying to cut his vehicle brakes, but he did not report it to the police because the police did nothing when Arenas filed a police report about Benitez and Karla breaking her windows. Granados was told Benitez threatened to get Jose, Jr., and Granados, but Benitez never personally threatened him. At the state postconviction evidentiary hearing, Granados testified trial counsel never discussed Granados's knowledge of prior instances of violence involving Benitez. (ECF Nos. 1-9 at 213; 34-5 at 180–83, 224–32.)

The Nevada Supreme Court has held "evidence of specific acts showing that the victim was a violent person is admissible if a defendant seeks to establish

---

[3]For clarity, the Court subdivides the claims alleged in Grounds 6–8.

self-defense *and was aware of those acts." Daniel v. State*, 119 Nev. 498, 515, 78 P.3d 890, 902 (2003) (emphasis in original). Such evidence "is relevant to the defendant's state of mind, *i.e.,* whether the defendant's belief in the need to use force in self-defense was reasonable." *Id.*

The Nevada Supreme Court determined Granados failed to establish either *Strickland* prong for this claim:

> Granados . . . argues that counsel should have investigated prior violent acts committed against him by one of the victims. Granados has not shown that counsel did not investigate these acts, as counsel questioned Granados about them at trial and testified that he discussed them with him. Granados also has not shown that further investigation would have uncovered evidence leading to a reasonable probability of a different outcome, as the jury was presented with an instance of this evidence such that additional instances would be cumulative. The district court therefore reached the correct result in denying this claim.

(ECF No. 1-10 at 150.)

The Nevada Supreme Court's determination is neither contrary to nor constitutes an unreasonable application of *Strickland*'s prejudice prong and is not based on an unreasonable determination of the facts in light of the evidence presented during the state court's proceedings. The record shows Granados failed to establish he was aware of the existence of any evidence of Benitez's prior acts of violence that were not presented to the jury, or persuasive independent corroborating evidence of such acts. Consequently there is no basis to conclude there was a reasonable probability the result of the proceedings would have been different had counsel investigated Benitez's prior acts of violence. Granados is not entitled to federal habeas relief for Ground 6(A).

### b.    Ground 6(B)—D.H.'s Testimony

Granados claims trial counsel failed to adequately investigate D.H.'s testimony before calling D.H. to testify and D.H.'s testimony undermined the self-defense theory. (ECF No. 2 at 30–32.)

///

At trial, D.H. testified that Granados was his uncle, and he was at Granados's house the day of the shootings. He said that earlier that morning, he saw a truck pull over across the street and men "saying stuff to us." He said he had just turned 15 years old, got "scared," and "ran inside." He claimed he was inside the house watching TV when he heard gunshots, but thought they were fireworks, and "didn't see" anything. He said he remained inside the house. On cross-examination, D.H. admitted he told police something different: that the shooting occurred because "they were mad" and "because they came out and threw bottles." In closing remarks, trial counsel argued D.H.'s testimony was "not really that important[;]" rather, what was important were the events leading up to and at the time of the shooting. (ECF Nos. 1-8 at 66; 34-5 at 122–30, 156.)

At the state postconviction evidentiary hearing, trial counsel testified he believed it was important to call D.H. to testify because D.H. gave a statement to police indicating he was aware someone made threats earlier that day. Counsel believed D.H.'s testimony would be helpful to the self-defense theory because it corroborated other testimony that Benitez and his companions "had stopped at least once across the street yelling slurs at the Granados family." Counsel believed he spoke with D.H. briefly before D.H. testified. Counsel thought D.H. "was going to be helpful for the case" but probably would not have called him as a witness had he known D.H. would deny knowing about the bottle throwing; however, at the time of trial, counsel "thought it was a good move to put him on the stand." Counsel did not fault himself for not having a better understanding of D.H.'s testimony because he "made a tactical decision to call a witness" and he "thought he brought out some things on direct that were useful" even though "on cross by the State he got turned around." Counsel did not think the inconsistencies in D.H.'s testimony undermined the defense because "in the end" Granados's testimony was the key to the case. (ECF No. 1-9 at 161–65.)

///

The Supreme Court of Nevada determined Granados failed to establish either *Strickland* prong:

> Granados . . . argues that counsel should not have called [D.H.] to testify. Counsel testified that he called [D.H.] to corroborate Granados' account that the victims had been menacing him that day. Decisions such as what witnesses to call or objections to raise are tactical decisions that lie with counsel. *Rhyne v. State*, 118 Nev. 1, 8, 38 P.3d 163, 167 (2002). "[C]ounsel's strategic or tactical decisions will be virtually unchallengeable absent extraordinary circumstances." *See Lara v. State*, 120 Nev. 177, 180, 87 P.3d 528, 530 (2004) (internal quotation marks omitted). Granados has not shown extraordinary circumstances warranting a challenge to counsel's performance, particularly as Hernandez's account in his police statement corroborated the relevant facts. Moreover, Granados has not shown prejudice, as the inculpatory portions of Hernandez's testimony were cumulative of other evidence. The district court therefore reached the correct result in denying this claim.

(ECF No. 1-10 at 150–51.)

The state supreme court's determination is neither contrary to nor constitutes an unreasonable application of *Strickland*'s prejudice prong and is not based on an unreasonable determination of the facts in the state court record. The record shows Granados did not establish a reasonable probability the result of the proceedings would have been different without D.H.'s testimony that the shooting was motivated by anger. Other trial evidence demonstrated a history of animosity and threats between Benitez and Granados and the circumstances supported an inference the shooting was motivated by anger. According to Sosa, he, Benitez, and Rodelo, threw bottles and yelled at Granados's residence. Granados and Arenas testified they were aware of the bottles. Arenas said she saw Benitez yelling slurs and profanity at their home. Granados saw Benitez following him in his truck that morning. Sosa testified that individuals located at Granados's residence beckoned Benitez to their home and Granados and Jose, Sr. immediately shot into Benitez's truck. Based on this record, the state supreme court reasonably applied *Strickland* in determining Granados failed to show a reasonable probability the result of the proceedings would have been different

without D.H.'s inculpatory testimony that, in his opinion, the shooting was motivated by anger. Granados is not entitled to habeas relief on Ground 6(B).

### c.    Ground 6(C)—Preparation of Granados's Testimony

Granados claims trial counsel failed to adequately explain the self-defense theory and prepare Granados to testify at trial. (ECF No. 2 at 32–34.)

In opening remarks, trial counsel told the jury that Granados would testify that he acted in self-defense:

> Mr. Granados will testify in this case as to why he did what he did, the fear he felt, the concern he felt when he saw Mr. Benitez—who he knew he had tension with because of Paula Arenas going back years—whip his truck around and drive it right at his house, right at his driveway, and you'll hear testimony about that, and of course it's for you to decide were his actions reasonable.
>
> This is a defense of self-defense.
> . . . .

(ECF No. 34-3 at 31.)

At the state postconviction evidentiary hearing, trial counsel testified the self-defense theory "was apparent from the get[-]go" as Granados had confessed that he acted in self-defense. Counsel generally spends time with clients who will testify "discussing what . . . I'm going to ask them on direct examination of [sic] what I think the State may ask them on cross." Counsel was sure he discussed the defense with Granados, including the elements of self-defense and how it applies. Counsel discussed "what we're going to have to show," "the kind of testimony we're going to need . . . so the jury understands that his conduct was justifiable, that his conduct was necessary or else he could have been killed." Counsel said "[w]hen you have self-defense," the defendant has to "put it on" and that counsel gave Granados a rough idea of the questions he would be asked at trial. Counsel said they talked about why Granados shot the gun because they had to explain why he pulled the rifle out and fired and why he did so when the truck came toward him. Granados told counsel he acted in self-defense because

he was frightened and concerned based on the events that occurred the day of the shooting. (ECF No. 1-9 at 152–55.)

At the state postconviction evidentiary hearing, Granados initially testified that counsel never discussed the issue of self-defense or the term self-defense with him before trial; instead, he said counsel simply told him, "[T]his is self-defense." Granados said he understood at trial that self-defense meant, "That's when your life is in danger, you know, it's either you or the other person." On cross-examination, he admitted trial counsel explained the requirements for self-defense "maybe once." Granados said counsel never asked him why he shot at the victims, but that counsel told him, "[Y]ou just have to tell them what [sic] you did it" and, "[Y]ou did it because . . . you feared for your life." Granados claimed that, had counsel spent more time preparing him to testify, he would have testified with less emotion, given more details, and explained that he acted to protect his family. (*Id.* at 190–92, 201, 212–15.)

The Supreme Court of Nevada determined Granados failed to meet either *Strickland* prong:

> Granados . . . argues that counsel should have prepared him better to testify. The decision to testify lies with the accused, [*Lara v. State*, 120 Nev. 177, 182, 87 P.3d 528, 531 (2004)], and Granados has not shown that counsel's preparation by discussing Granados' anticipated testimony with him beforehand was objectively unreasonable. Further, Granados has not shown a reasonable probability of a different outcome, as he alleged that he would have conveyed the same account of events with additional preparation, albeit less emotionally. The district court therefore reached the correct result in denying this claim.

(ECF No. 1-10 at 151–52.)

The state supreme court's determination is neither contrary to nor constitutes an unreasonable application of *Strickland*'s prejudice prong and is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. Granados did not testify at the postconviction evidentiary hearing about any facts he failed to provide at trial

24

that would support a reasonable probability the result of the proceedings would have been different had counsel spent more time preparing him to testify at trial. Granados is not entitled to federal habeas relief for Ground 6(C).

### 5.    Ground 7—Failure to Utilize Expert Witnesses

Granados alleges trial counsel failed to utilize experts about (A) the effect of alcohol intoxication on the conduct of the victims at the time of the shooting; and (B) the relationship between the physical forensic evidence found at the scene and eye-witness testimony. (ECF No. 2 at 37–40.)

Trial counsel argued in closing remarks to the jury that the intoxication of the victims created a situation that contributed to Granados's mindset. (ECF No. 1-8 at 54–55, 62–63.) At the postconviction evidentiary hearing, counsel stated he hired an investigator and an expert psychologist, but "as far as other experts," in counsel's opinion, this "was not an expert type case." Counsel said the case was about whether Granados was in fear for his life and "if he was, that homicide was justifiable." Counsel hired a psychologist because he thought he might show Granados's actions were the result of Post-Traumatic Stress Disorder, but the expert's reports did not explain what happened. (ECF No. 1-9 at 172–74.)

The Supreme Court of Nevada determined Granados failed to establish either *Strickland* prong:

> Granados . . . argues that counsel should have retained experts on alcohol intoxication and forensic evidence regarding the victim's truck. Deciding which witnesses to call is a tactical decision, and counsel testified he retained expert witnesses that he declined to call, having concluded that their testimony would not be useful. Granados has not shown extraordinary circumstances warranting a challenge to counsel's performance in this regard or prejudice. Other witnesses testified about the victim's intoxication and aggressiveness such that counsel was able to argue those traits without an expert. And as Granados has merely speculated that a physical forensic evidence expert would be able to determine the crashed vehicle's pre-crash speed and trajectory without showing that such a determination was possible, he has not shown that such an omission was unreasonable or prejudicial. The district court therefore reached the correct result in denying this claim.

(ECF No. 1-10 at 151.)

### a.    Ground 7(A)—Expert on Effects of Intoxication

The state supreme court's determination that Granados was not prejudiced by counsel's failure to call an expert on intoxication is objectively reasonable. At trial, counsel argued the intoxication of the victims contributed to Granados's fear. The testimony established Benitez and Rodelo had been drinking heavily for several hours and threw beer bottles on Granados's driveway. The medical examiner testified that Benitez and Rodelo had consumed cocaine, and Benitez's blood-alcohol content was three times the legal limit (and could have been higher at the time Benitez was shot). Granados and others testified about Benitez's acts of aggression that day and on previous occasions. The state supreme court reasonably concluded Granados failed to demonstrate a reasonable probability the result of the proceedings would have been different had counsel consulted and called an expert about the effects of intoxication on Benitez's behavior toward Granados. Granados is not entitled to federal habeas relief for Ground 7(A).

### b.    Ground 7(B)—Accident Reconstruction Expert

The Nevada Supreme Court's determination that Granados was not prejudiced by counsel's failure to call an expert on the relationship between forensic evidence found at the scene of the shooting compared to the eyewitness accounts, is objectively reasonable. Granados speculates a physical forensic evidence expert could determine the speed and trajectory of Benitez's vehicle, but Granados failed to show such a determination was possible. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (holding speculation that an arson expert would have testified on his behalf at trial is insufficient to establish prejudice) (citing *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (speculation about expert testimony is not enough to establish prejudice)). Moreover, it appears that the jury could sufficiently approximate the speed, distance, and trajectory of Benitez's vehicle based on the testimony, surveillance video, and photographs. Thus, it was objectively reasonable for the state supreme

court to conclude Granados did not show there is a reasonable probability the result of the proceedings would have been different had counsel obtained an expert to testify about the speed and trajectory of Benitez's vehicle. Granados is not entitled to federal habeas relief for Ground 7(B).

### 6.    Ground 8—Objection to Evidence and Comments

Granados alleges trial counsel was ineffective in failing to object to the State's presentation of improper evidence, file pretrial motions to exclude evidence, and object to the prosecutor's comments. (ECF No. 2 at 40–54.)

### a.    Ground 8(A)(1)—Firearms Evidence

Granados alleges counsel failed to object to references during opening statements and testimony about unrelated firearm evidence found at the residences of Jose, Sr., and Granados's sister, as irrelevant and more prejudicial than probative. (ECF No. 2 at 43–47, 54.)

The United States Supreme Court has stated:

> The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice. (Footnotes omitted).

*Michelson v. United States*, 335 U.S. 469, 475–76 (1948); *see also Tavares v. State*, 117 Nev. 725, 730, 30 P.3d 1128, 1131 (2001) ("We have often held that the use of uncharged bad act evidence to convict a defendant is heavily disfavored in our criminal justice system because bad acts are often irrelevant and prejudicial and force the accused to defend against vague and unsubstantiated charges" and "[t]he principal concern with admitting such acts is that the jury will be unduly influenced by the evidence, and thus convict the accused because it believes the accused is a bad person.").

27

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith" but it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Nev. Rev. Stat. § 48.045(2). Relevant evidence may, however, be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." Nev. Rev. Stat. § 48.035(1).

In opening remarks to the jury, the State argued firearms and ammunition were found at the home of Jose, Sr., and the home where police located Granados's truck:

> When a search warrant is served upon Jose Senior's address at 5076, they find . . . Winchester bullets that match the type of cartridge casings that are found in the driveway. They also find the other Wolf bullets—Wolf brand bullets with the identification of Jose Senior there as well. Also found, a number of firearms are at that residence. Magazines are at that residence, and when they look at the defendant's home, they also find, for instance, pamphlets of using more high-powered rifles.
>
> Now, certainly, as we talked about guns and whatnot yesterday, it's certainly not illegal for certain individuals to own firearms, but this isn't about owning guns, ladies and gentlemen. This is about having knowledge of how to use certain types of guns. This is about knowing what a gun is, and how to use it and how to fire that gun.
>
> Now, as I mentioned, this all took place on August 10th of 2009. The very next day, August 11, 2009, the police are looking for . . . Granados, and their investigation takes them to Los Angeles where they find [his truck] parked outside of a residence . . . [Granados] wasn't there though.
> . . . .
> What they also find in Los Angeles though when they served a search warrant there is a number of items. They find Wolf bullets, which match again the type of caliber that's found at the 5086 driveway. They also find AR-15—an AR-15, which is the same type of gun that had been used in this type of case.

(ECF No. 34-3 at 23–24.)

At trial, Crime Scene Analyst Nemcik testified police recovered two types of cartridge cases at the scene of the shooting: 22 cartridge cases designated Wolf

28

7.62 x 39; and six .40 caliber cartridge cases marked S&W. Nemcik did not find firearms or ammunition inside Granados's residence; however, police found an Airsoft gun and a CO2 propelled gun in his backyard. Nemcik said police found six .40 caliber cartridge cases on the driver's side of Benitez's truck and matching unspent cartridges inside the residence of Jose, Sr. She said police also collected from Jose, Sr.'s residence: a Bushmaster semiautomatic rifle; a Remington 20-gauge shotgun; 20-gauge cartridges; and cartridges bearing headstamp 5.5686. (ECF No. 34-3 at 61–64, 70–74, 85.)

Metro firearms forensic scientist Dinah Angel Moses testified none of the firearms found at either of the Granadoses' residences shot the bullet fragments and cartridge cases found at the scene. Moses determined each of the .40-caliber cases found at the scene were fired from a single .40-caliber firearm. Likewise, each of the 7.62 cases from the scene were fired from a single 7.62 x 39-caliber firearm. (ECF No. 34-4 at 29–34, 37–38, 43–45.)

Sergeant O'Brien testified police executed a search warrant and found evidence related to firearms at the residence of Granados's sister in Los Angeles where "a bunch of people," but not Granados, were found. (ECF No. 34-5 at 66–67.) Trial counsel objected when the State moved to admit photographs of the items and the trial court excluded photographs of firearms that were not used in the shootings but admitted photographs of ammunition matching the ammunition found at the scene:

> [DEFENSE COUNSEL]: I'll note a general relevance objection. If I can approach and make some arguments.
>
> THE COURT: Yeah. No, I understand. Why don't you approach.
>
> (Bench conference transcribed as follows.)
>
> [DEFENSE COUNSEL]: So my objection to these exhibits—
>
> THE COURT: Could I see the photos?
>
> [THE STATE]: You bet.

1

THE COURT: I want to see what's depicted in them. Go ahead.

2

3

[DEFENSE COUNSEL]: So my objection to the exhibits is that—as we know from the previous testimony of CSA Moses, that none of the weapons found in Los Angeles were related or used in the shootings at issue.

4

5

6

So it's somewhat a question of why it's even been presented, because it's not evidence of the case, and none of the guns found were related to any of the bullet fragments found outside [inaudible]. It's more prejudicial than probative, and I think that it's leading to confusion to the jury.
. . . .

7

8

9

10

[THE STATE]: But they have access to the weapons. Also, there was ammunition that matches the ammunition that was used at the scene. In fact, there was a Smith & Wesson .40 caliber, and I think there was the Wolf [inaudible] in there. So those were the same type of brand and caliber of the fire—the cartridges that were shot at the day before.

11

12

13

THE COURT: I'll allow the photographs that show the same type of ammunition that was used, but I don't want evidence of these guns coming in if these are not the guns that were the subject of the shooting. It would be prejudicial.

14

[THE STATE]: The only problem is there's been testimony that—

15

THE COURT: There's what?

16

[THE STATE]: There was guns tested from L.A. [inaudible].

17

[DEFENSE COUNSEL]: It was probably her report, but at the same time they [inaudible] photographs of it, so.

18

THE COURT: I think it would be unfairly prejudicial, but I'll allow the .40 caliber and the Wolf ammunition photos.

19

20

(*Id.* at 69–70.) Thereafter, O'Brien testified police found at the home of Granados's

21

sister, .40-caliber S&W ammunition and Wolf 7.62 ammunition consistent with

22

the types of cartridge cases found at the scene of the shooting. (*Id.* at 71–72.)

23

The Supreme Court of Nevada determined Granados failed to meet the

24

requirements of either *Strickland* prong:

25

26

27

28

Granados . . . argues that counsel should have challenged the State's opening-statement reference to and testimony regarding firearms not used in the offense that were recovered from the co-perpetrator's residence as more unfairly prejudicial than probative. Despite the presumption that counsel performed reasonably, Granados failed to ask any questions at the evidentiary hearing regarding counsel's decision not to object in this regard. Further,

30

> Granados has not shown prejudice, as a challenge would have failed
> because the testimony was relevant to rebut Granados' assertion
> that he was unfamiliar with firearms and not significantly
> prejudicial. *See* NRS 48.035(1). The district court therefore reached
> the correct result in denying this claim.

(ECF No. 1-10 at 152.)

On deferential review, the Court finds the Nevada Supreme Court reasonably concluded Granados failed to meet *Strickland*'s prejudice prong. The prosecutor argued that firearm possession was not in itself a crime. The State's experts testified that none of the weapons found at any of the Granadoses' residences fired the shots, but that ammunition matching the ammunition that Granados admittedly shot, was found at the home of Jose, Sr., and where Granados's truck was later found. Granados admitted he placed his loaded semi-automatic firearm in his truck, and upon Benitez's arrival, pulled it out and shot at the victims. It was objectively reasonable for the state supreme court to conclude argument and evidence about other firearms and ammunition found at the residences of Granados's family members was "not significantly prejudicial" as to present a reasonable probability the result of the proceeding would have been different had counsel made further objections and the state district court excluded the State's argument and evidence concerning firearms not used for the shootings. Granados is not entitled to federal habeas relief for Ground 8(A)(1).

### b.    Ground 8(A)(2)—Interest in Benitez's Sister

Granados alleges trial counsel failed to object to testimony that implied he wished to date minor females, as irrelevant and more prejudicial than probative. (ECF No. 2 at 46–47.)

Benitez's sister, Karla, testified that while she was in high school, Jose, Jr. told her Granados saw her photograph and expressed interest in meeting her. Karla was not interested in meeting Granados because Benitez did not like the idea, told her to stay away from him, and said Granados was "way older." Arenas testified Granados was 28 years old and she was 17 or 18 years old when Jose,

Jr. introduced them. (ECF Nos. 34-3 at 225–26; 34-4 at 116–18.)

At the state postconviction evidentiary hearing, counsel testified he did not object to this testimony because it was important to the defense case:

> Q:    So, what value to the defense would the fact that an adult, your client, Richard Granados, was interested in dating a freshman from high school?
>
> A:    Yeah. I see where you're going with it now in a vacuum at the time. That means nothing. I mean, I didn't see that there's an issue. That's not—it's nothing that I felt impacted the case. It's such a minor issue. What was more important was the fact that there was a relationship between Mr. Granados and his family and the Benetiz [sic] family and that formed the basis of this ill will that was part of the defense in this case.
>
> Q:    And you don't think that this is character evidence that maybe a mistrial should be based on or requested?
>
> A:    Well, no, because it has to—this is one of those cases where it needs to come in because it's part of the foundation to show that there was a relationship, a connection between the two families, and that was vital to going into our, I believe, and what I discussed with Richard about, to Mr. Granados about, why he felt afraid and why he felt afraid of these people. You know, if he didn't know them then he wouldn't even be out there with maybe—with a gun in his truck. It would just be some stranger coming by and he wouldn't even know who they are, who they were. He knew who they were in the blue F-150, Mr. Benetiz's [sic] truck, I think.
>
> Q:    So, his interest in dating a freshman female was part in parcel in your mind part of that history of the two families?
>
> A:    Yeah. As part of explaining the relationship with—between the two families . . . That was never an issue, never brought up, and the fact that was even said was such a non-event. It was more important to describe the relationship between the two families and that's where I went. And that's why I didn't object to it.

(ECF No. 1-9 at 170–72.)

The Nevada Supreme Court determined Granados failed to establish deficient performance under *Strickland*:

> Granados . . . argues that counsel should have challenged testimony regarding his alleged involvement with underage girls. The relevant testimony merely established that, years earlier, Granados was interested in meeting one of the victims' sister[s] when she was in high school and he in his twenties, apparently angering the victim.

1
2
3
4

> Deciding whether to object is a tactical decision, and counsel testified that he declined to object because Granados' sexual conduct was not at issue and the animosity between the families was. Granados has not shown extraordinary circumstances warranting a challenge to this decision, particularly as it advanced the defense theory of the case. The district court therefore reached the correct result in denying this claim.

5    (ECF No. 1-10 at 152–53.)

6    The state supreme court's determination is neither contrary to nor
7    constitutes an unreasonable application of *Strickland*'s performance prong and
8    is not based on an unreasonable determination of the facts. Counsel's
9    explanation that he did not object because he believed the testimony supported
10   the theory that the animosity between Benitez and Granados caused Granados's
11   fear and acts in self-defense, was objectively reasonable, as is the determination
12   that counsel's action is not outside the wide range of reasonable professional
13   assistance. Granados is not entitled to federal habeas relief for Ground 8(A)(2).

14              **c.    Ground 8(B)— Prosecutor's Opening Remarks**

15   Granados alleges trial counsel was ineffective in failing to object and move
16   for mistrial based on the prosecutor's argumentative comments during opening
17   statement. (ECF No. 2 at 47–50.)

18   Before opening remarks, the trial court instructed the jury it must consider
19   the evidence in deciding the facts in the case and that the statements and
20   arguments of the attorneys are not evidence. The court explained: "An opening
21   statement is not evidence. It is simply an outline to help you understand what
22   that party expects the evidence will show." (ECF No. 34-3 at 10–11, 15.)

23   In opening statement, the prosecutor asserted "the evidence is not going to
24   support self-defense in this case . . . ." and argued:

25
26
27

> You're going to have videos, ladies and gentlemen, and it's going to help you determine that in this particular case the defendant was getting ready, was gearing up to shoot Carlos Benitez. This was not a case of reactionary self-defense, ladies and gentlemen.

28

> And if Carlos—if Bob Dylan was correct that you can't be wise and in love at the same time, and we agree that Carlos may have

been in love and he was making poor decisions, well, I would also say that just because you're in love and if the defendant was in love with Paula, it does not give you a right to commit premeditated, deliberate murder, ladies and gentlemen, and that's what the evidence in this case is going to show.

(ECF No. 34-3 at 25–26.) The trial court later again instructed that "[s]tatements, arguments and opinions of counsel are not evidence in the case." (ECF No. 34-2 at 141.)

The Supreme Court of Nevada determined Granados failed to establish either *Strickland* prong:

Granados . . . argues that counsel should have challenged the prosecutor's opening statement for several reasons. Granados has not shown deficient performance or prejudice, as the challenged statements were not improper. The statement that "I would also say that just because you're in love and if the defendant was in love with Paula, it does not give you a right to commit premeditated deliberate murder" was not an improper statement of personal opinion, but rather a statement about when a justified killing is not murder. *See Collier v. State*, 101 Nev. 473, 480, 705 P.2d 1126, 1130 (1985) (discussing the bar against a prosecutor's improper injection of personal opinion into the proceedings); *see also Jimenez v. State*, 106 Nev. 769, 772, 801 P.2d 1366, 1368 (1990) (implicitly providing that the use of the pronoun "I" does not render a statement personal opinion). Next, the prosecutor did not improperly prejudge Granados' guilt by stating that the evidence would show he did not act in self-defense; such comments are permissible. *See Watters v. State*, 129 Nev. 886, 889, 313 P.3d 243, 247 (2013) (observing that the opening statement serves to state the issues and evidence to be presented). The district court therefore reached the correct result in denying this claim.

(ECF No. 1-10 at 153.)

The state supreme court's application of *Strickland* was objectively reasonable and is not based on an unreasonable determination of the facts in the state-court record. Failure to object to the prosecutor's remarks that love is not a legal justification for murder was not deficient because objection was futile; the statement is true and defense counsel argued in opening remarks that the defense was "self-defense." *See supra* at p. 23; *see also Cunningham v. Wong,* 704 F.3d 1143, 1159 (9th Cir. 2013) ("[A]bsent egregious misstatements, the failure to object during closing argument and opening statement is within the

wide range of permissible professional legal conduct."). Moreover, the trial court explained that the purpose of opening remarks was to establish what each party believed the evidence would show and that the opinions of counsel are not evidence. Because the application of *Strickland's* prejudice prong is objectively reasonable, Granados is not entitled to federal habeas relief for Ground 8(B).

### d.    Ground 8(C)—J.G.'s Statement

Granados alleges trial counsel failed to make hearsay and confrontation clause objections to the testimony of Detective Clifford Mogg, who testified to the contents of statements J.G. made to him on the day of the shooting. (ECF No. 2 at 50–52.) Granados further claims counsel should have objected to Mogg's speculation that J.G. was honest during their interview. (*Id.*)

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004).

At trial, J.G. testified that Granados was her uncle, she was 11 years old at the time of the shootings, and she did not remember it. She did not recall giving a statement to Detective Mogg on the day of the shootings. Detective Mogg subsequently testified he interviewed J.G. the day of the shooting. Mogg said J.G. told him that earlier that day, she, Arenas, Jose, Jr., and J.G.'s brothers, were outside while two men in a truck with beers in their hands were saying bad things. J.G. told Mogg the men did not threaten her family, but she thought the men had followed Granados. J.G. told Mogg that Granados was standing in the driveway but the "truck just wanted to hit the wall." Mogg said J.G. told him she

believed the people in the truck wanted to hurt her brother, Jose, Jr., but he did not want to fight. (ECF No. 34-3 at 184–85, 192–205, 211–12.)

The Supreme Court of Nevada determined Granados failed to establish either *Strickland* prong:

> Granados . . . argues that counsel should have challenged Detective Mogg's recitation of Granados' niece's police statement as hearsay. Granados has not shown deficient performance or prejudice, as an objection would have failed. Mogg's recitation was admissible as a prior inconsistent statement after the niece testified that she did not remember the matters attested to in her police statement and was subject to cross-examination. *See* NRS 51.035(2)(a). The district court therefore reached the correct result in denying this claim.

(ECF No. 1-10 at 153–54.)

The Nevada Supreme Court's determination is neither contrary to nor constitutes an unreasonable application of *Strickland* and is not based on an unreasonable determination of the facts in the state-court record. J.G. appeared at trial, was sworn, testified, and was subject to cross examination. Thus, objection based on the confrontation clause was futile. Objection based on hearsay was also futile because, the Nevada Supreme Court, as the final arbiter of state law, determined Mogg's testimony was admissible under state law. Finally, even assuming counsel was deficient in failing to object to Mogg's speculation that J.G. was truthful, there is no reasonable probability the result of the proceedings would have been different had Mogg's speculation been stricken. Some of J.G.'s statements, as stated by Mogg, supported the defense. Thus, the state supreme court's rejection of this claim is objectively reasonable, and Granados is not entitled to federal habeas relief for Ground 8(C).

### e.      Ground 8(D)—Opinion Testimony on Ultimate Issue

Granados alleges trial counsel was ineffective in failing to object to the testimony of Sergeant O'Brien that he would not have arrested Granados if the self-defense claim was valid. Granados claims the testimony constituted a legal conclusion that invaded the province of the jury on the ultimate issue to be

decided in the case. (ECF No. 2 at 52–54.) He further alleges trial counsel was ineffective because counsel opened the door to O'Brien's testimony. (*Id.*)

During voir dire, trial counsel asked the venire whether anyone believed "just because the police arrest someone that person must be guilty" and no one responded. Counsel asked if the venire believed "sometimes police who are human too make mistakes in investigations . . . " and remarked, "[i]t looks like pretty much everyone agrees with that statement." (ECF No. 1-4 at 191–92.)

During cross-examination, trial counsel elicited O'Brien's testimony that, despite Granados's claim that he acted in self-defense, O'Brien nonetheless arrested him for murder. *See supra* pp. 13–14. On redirect, the State elicited O'Brien's opinion that he did not believe Granados acted in self-defense:

> Q:   And I think Mr. Kennedy suggested that you were going to arrest Mr. Granados and let him—well, let the self-defense issues come out in court. Do you remember those questions?
>
> A:   Yes.
>
> Q:   When you—are there times in your investigations where, and in previous investigations where the evidence would suggest self-defense and you talk to someone and they claim self-defense so you don't arrest them?
>
> A:   Yes.
>
> Q:   And do you as an investigator with the Las Vegas Metropolitan Police Department have to make a determination as to whether a claim of self-defense is supported by the evidence in the case in order to decide whether to arrest someone?
>
> A:   Yeah, absolutely. I've been in scenarios with that where I haven't made arrests, where somebody claims self-defense and that's what the evidence proved to be, that it was a self-defense, like a home invasion thing or something.
>
> Q:   So obviously you didn't believe this to be self-defense based upon all the evidence and that's why you arrested him; is that correct?
>
> A:   I absolutely do not believe that this was self-defense.

///

///

///

37

(ECF No. 34-5 at 113–14.)[4]

In closing remarks, the State argued Granados gave few facts about self-defense to O'Brien and the self-defense theory was not believable based on the undisputed evidence. The trial court instructed the jury its duty was to "apply the rules of law contained in these instructions to the facts of the case and determine whether or not the Defendant is guilty of one or more of the offenses charged." The jury was furthermore instructed if evidence of self-defense was present, the State had the burden to prove beyond a reasonable doubt that Granados did not act in self-defense; otherwise, it must find Granados not guilty of murder. (ECF Nos. 1-8 at 41, 47–48; 34-2 at 106, 129.)

At the state postconviction evidentiary hearing, trial counsel testified it was futile to object to O'Brien's opinion that Granados did not act in self-defense:

> Q:  And do you recall that the detective . . . was asked essentially if self-defense was applicable in this case?
>
> A:  That question was asked, yes.
>
> Q:  And then he—do you remember what he responded?
>
> A:  Well, predicatively, he said no.
>
> . . . .
>
> Q:  And you didn't object to that?
>
> A:  That was his opinion.
>
> Q:  You don't believe there was a basis for an objection?
>
> A:  Well, let's preface that. It was Detective O'Brien who interviewed Mr. Granados who admitted the shooting and Mr. Granados said it was self-defense at the time. Detective O'Brien, of course, had a different view of things. The fact that he would give his opinion that way is not surprising. He actually arrested my client and he believes that it was two murders.
>
> So, it's not surprising that he would support the State's theory of the case. And that's—I'm not surprised. Is that a basis for a [sic] objection to say that officer, you know, he gave sort of a

---

[4] The State disclosed Sergeant O'Brien as an expert "in crime scene investigation of violent death scenes and interpretation of evidence found at the crime scenes . . . ." (ECF No. 34-2 at 29–20.)

[sic] opinion testimony. He's not an expert, but certainly he's had years of experience and he gave his opinion that, in his view, it wasn't self-defense. And that's not surprising that a Metro detective would say that.

Q:   And I certainly don't—so my query, obviously is why—if you should have objected on a legal conclusion or, you know—obviously—

A:   Could you say that? Sure, sure, of course, you can say, oh, objection, legal conclusion, and sustained, and then everybody moves on. But the jury heard it and that's that. I mean, could I have asked for a limited [sic] instruction potentially. I don't think that's dipositive of the case what this Metro detective said who was not there the day that Richard Granados had to shoot to save his life.

Q:   So, what about just the issue of opening the door and asking him the elements of self-defense and why it applied in this particular case. In retrospect, was that a dangerous—dangerous way to go or would you have not done that?

A:   I think what I was trying to do in trying to remember back was to get some of these concepts to the jury that Metro had a potentially self-defense situation. They viewed it differently, again, not surprising, and just, again, trying to play to the jury to get the evidence out there. It's not surprising, again, that Metro had a different view on things.

. . . .

Q:   —how would in any scenario when a detective says that this is absolutely not self-defense, how would that benefit a Defendant?

A:   I mean, that answer is not beneficial. But, again, this detective was not there immediately after the scene as far as arrived on the scene after the murders had occurred. I don't recall that. He did arrest my client in Los Angeles sometime thereafter. But, I mean, going back I don't see that that was some sort of make or break situation. You know, in trial, everything unfortunately does not go smoothly especially when you're dealing with police witnesses.

(ECF No. 1-9 at 166–69.)

The Supreme Court of Nevada concluded Granados failed to establish prejudice under *Strickland*:

Granados . . . argues that counsel should have challenged Detective O'Brien's testimony as improper expert testimony regarding the ultimate issue in the case. Alternatively, he argues that the testimony should have been challenged as more unfairly prejudicial than probative. Granados has not shown prejudice. The jury was urged through cross-examination that the determination as to whether Granados acted in self-defense was for the jury to make,

1
2
3

not O'Brien; properly instructed on the standard for self-defense; and empowered to reach its own conclusion. In these circumstances, we are not convinced that Granados demonstrated a reasonable probability of a different outcome but for trial counsel's failure to object. The district court therefore reached the correct result in denying this claim.

4

(ECF No. 1-10 at 154) (footnote omitted).

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

The state supreme court's determination is neither contrary to nor constitutes an unreasonable application of *Strickland's* prejudice prong and is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. During voir dire, none of the prospective jurors indicated they would accept law enforcement's arrest of an individual as dispositive of guilt. Trial counsel cross-examined O'Brien about Granados's claim of self-defense and the state district court ensured the jury understood that the State had the burden to prove Granados did not act in self-defense. *See supra* pp. 13–14. The jury was later instructed on the requirements of self-defense and the parties argued the evidence concerning self-defense to the jury in closing arguments. Under the circumstances, the state supreme court's determination that Granados failed to establish a reasonable probability the result of the proceedings would have been different had counsel objected to O'Brien's opinion that he believed Granados did not act in self-defense, was objectively reasonable. Granados is not entitled to federal habeas relief for Ground 8(D).

20

#### f.    Ground 8(E)—Failure to File Pretrial Motions

21
22
23
24

Granados alleges trial counsel should have filed pretrial motions precluding evidence of firearms that were not used in the commission of the offenses and about Granados's interest in meeting Karla and Arenas when they were teenagers, even though Granados was in his late 20's. (ECF No. 2 at 54.)

25
26
27
28

The Nevada Supreme Court held in a footnote to its affirmance of the state district court's denial of state habeas relief that: "Granados also argues that counsel should have challenged several of the preceding issues by pretrial motion. As the underlying challenges lacked merit as trial challenges, counsel

was also not ineffective in omitting pretrial challenges." (ECF No. 1-10 at 154 n.1.) For the reasons discussed, the Supreme Court of Nevada's determination constitutes an objectively reasonable application of *Strickland* to the claims that counsel should have filed pretrial motions precluding evidence of firearms that were not used in the commission of the offenses and about Granados's interest in meeting Karla and Arenas when they were teenagers, even though Granados was in his late 20's. Therefore, Granados is not entitled to federal habeas relief for Ground 8(E).

### 7.    Ground 9—Concession of Guilt for Murder

Granados alleges trial counsel conceded Granados's guilt in closing argument by characterizing the shooting as "murder." (ECF No. 2 at 55–56.)

The Supreme Court of Nevada determined Granados failed to establish either *Strickland* prong:

> Granados . . . argues that counsel should not have conceded that the killings were "murder" during closing argument. The record repels this claim. Counsel was arguing against the State's theory of the case in the relevant portions. Granados accordingly has not shown deficient performance or prejudice. The district court therefore reached the correct result in denying this claim.

(ECF No. 1-10 at 154.)

The state supreme court's application of *Strickland*'s prejudice prong is objectively reasonable. Trial counsel's closing remarks are replete with arguments that the shootings occurred in self-defense. Counsel specifically referred to the self-defense instructions and argued "when you look at how [these facts], when you look at how they apply to how the shooting occurred, this is a self-defense situation" and there was no evidence of "any deliberate plan to commit a murder that day." Counsel's reference to the prosecutor's theory about "how he thinks the murder occurred," refers to the State's theory that a murder occurred and was followed by counsel's argument that the killings occurred in self-defense. (ECF No. 1-8 at 50–71.) The state supreme court's application of *Strickland*'s

41

1    prejudice prong to the record was objectively reasonable. Granados is not entitled

2    to federal habeas relief for Ground 9.

3          **C.    Ground 10—Cumulative Error**

4          Granados alleges that even if no individual instance of error denied him a

5    fair trial, the cumulative effect of instances of error, taken together, deprived him

6    a fair trial, warranting a new trial. (ECF No. 2 at 56–57.)

7          "[T]he Supreme Court has clearly established that the combined effect of

8    multiple trial errors may give rise to a due process violation if it renders a trial

9    fundamentally unfair, even where each error considered individually would not

10   require reversal." *Parle v. Runnels*, 505 F.3d 922, 927–28 (9th Cir. 2007) (citing

11   *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) and *Chambers v. Mississippi*,

12   410 U.S. 284, 298, 302–03 (1973)). "[C]umulative error warrants habeas relief

13   only where the errors have "so infected the trial with unfairness as to make the

14   resulting conviction a denial of due process." *Id.* (citing *Donnelly*, 416 U.S. at

15   643.) "Such 'infection' occurs where the combined effect of the errors had a

16   'substantial and injurious effect or influence on the jury's verdict.'" *Id.* (citing

17   *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

18         In *Browning v. Baker*, the Ninth Circuit held, "[w]hile an individual claiming

19   [ineffective assistance of counsel] 'must identify the acts or omissions of counsel

20   that are alleged not to have been the result of reasonable professional judgment,'"

21   courts must "consider[] counsel's conduct *as a whole* to determine whether it was

22   constitutionally adequate." 875 F.3d 444, 471 (9th Cir. 2017).

23         The Nevada Supreme Court determined Granados failed to establish

24   multiple instances of deficient performance to cumulate:

25           [G]ranados argues that the cumulative effect of counsel's
        deficient performance warrants relief. Even assuming that multiple

26           deficiencies in trial counsel's performance may be cumulated to
        demonstrate prejudice in a postconviction context, *see McConnell v.*

27           *State*, 125 Nev. 243, 259, 212 P.3d 307, 318 (2009), Granados has
        not demonstrated multiple instances of deficient performance to

28           cumulate.

(ECF No. 1-10 at 155.) The state supreme court's application of Supreme Court authority in rejecting this claim was neither contrary to nor an unreasonable application of clearly established federal law, as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court's proceedings, as there are no errors to cumulate. Granados's IAC claims, as a whole, do not show that, under the circumstances, trial counsel's actions or omissions were deficient and prejudicial or that Granados received constitutionally inadequate assistance from counsel in denial of due process. Granados is not entitled to habeas relief for Ground 10.

## V.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Granados. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a certificate of appealability ("COA"). Therefore, the Court has sua sponte evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). "To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right," and for claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether this Court's procedural ruling was correct. *Id.* Applying these standards, a certificate of appealability is warranted for Grounds 1, 5, and 10. Jurists of reason would not find it debatable or wrong whether the Court is correct in its procedural ruling dismissing Grounds 2 and 3 as not cognizable and finding that Ground 6(D) is unexhausted. Reasonable jurists would

furthermore not find the Court's assessment of Grounds 4 and 6–9 debatable or wrong.

## VI.    CONCLUSION

IT IS THEREFORE ORDERED that Grounds 1 and 4–10 are denied on the merits and the petition (ECF No. 2) is denied with prejudice.

IT IS FURTHER ORDERED that a Certificate of Appealability is granted for Grounds 1, 5, and 10 and denied for Grounds 4, and 6–10.

IT IS FURTHER ORDERED that any requests for an evidentiary hearing are denied.

IT IS FURTHER ORDERED that the clerk of the court shall substitute Nethanjah Breitenbach for the respondent Tim Garrett.

IT IS FURTHER ORDERED that the clerk of the court enter a final judgment in favor of Respondents and against Granados dismissing this action with prejudice and close this case.

DATED THIS 19th day of March 2025.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE